**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **STRAGENT, LLC, ET AL.,** | § | |
| | § | |
| *Plaintiffs*, | § | **CIV. ACTION NO. 6:11-CV-421-TBD-** |
| | § | **JDL** |
| **v.** | § | |
| | § | |
| **INTEL CORPORATION,** | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**INTEL'S MOTION TO RECOVER ATTORNEYS' FEES**

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Argument ..................................................................................................................... 3

    I.    Attorneys' Fees May Be Awarded Both for Baseless Claims and for Vexatious Litigation and Other Kinds of Litigation Misconduct ......................... 3

    II.    Stragent's Claims Were Objectively Baseless and Pursued in Bad Faith ............ 4

        A.    Stragent's Liability Theory Was Objectively Baseless ............................ 4

            1.    Stragent Had No Basis for Filing Suit in the First Place ............... 4

            2.    Stragent's Infringement Claims Were Baseless -- "Two" Is Not "One" ...................................................................................... 5

        B.    Stragent Pursued Baseless Positions on Validity ....................................... 7

        C.    Stragent's Damages Theory Was Also Frivolous ...................................... 8

            1.    Stragent Tried to Rely on a Bogus Hedonic Regression Model ........................................................................................... 8

            2.    Stragent's Damages Theory Violated the Entire Market Value Rule ...................................................................................... 9

        D.    Stragent Conduct Meets the Standard for "Exceptional" Cases .............. 11

    III.    Stragent Engaged in Litigation Misconduct ...................................................... 12

        A.    Stragent Used a Ruse to Join a Local Charity as a Co-Plaintiff .............. 12

        B.    Stragent Asserted the '244 Patent Even Though It Sought Neither an Injunction Nor Damages for Intel's Alleged Infringement of that Patent.......................................................................................... 13

        C.    Stragent Continued to Assert Some Patents and Claims Even After Its Expert Had Determined that Intel Did Not Infringe Them ................ 13

        D.    Stragent Obstructed the Claim Construction Process ............................. 14

        E.    Stragent Waited Until Intel's Time to Seek *Inter Partes* Reexamination Had Expired Before Asserting Claim 16 of the '072 Patent ............................................................................................. 14

        F.    Stragent Filed Separate Suits Against Intel's Customers to Pressure Intel into Agreeing to Include Non-U.S. Processors into the Royalty Base ......................................................................................... 14

Conclusion ................................................................................................................. 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AVM Techs., LLC v. Intel Corp.*,
   Civ. A. No. 10–610–RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013)......................................10

*Dynetix Design Solutions, Inc., v. Synopsys, Inc.*,
   No. C 11–05973 PSG, 2013 WL 4538210 (N.D. Cal. Aug. 22, 2013)...................................10

*Eon-Net LP v. Flagstar Bancorp*,
   653 F.3d 1314 (Fed. Cir. 2011)........................................................................3, 11, 12, 14

*IA Labs CA, LLC v. Nintendo Co.*,
   Civ. No. PJM 10-833, 2012 WL 1565296 (D. Md. May 1, 2012)..........................................13

*Kilopass Tech., Inc. v. Sidense Corp.*,
   738 F.3d 1302 (Fed. Cir. 2013).................................................................................3, 11, 15

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)....................................................................................8, 10, 11

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009).............................................................................................8

*MarcTec, LLC v. Johnson & Johnson*,
   664 F.3d 907 (Fed. Cir. 2012)..............................................................................3, 9, 11, 12

*Mirror Worlds, LLC v. Apple, Inc.*,
   784 F. Supp. 2d 703 (E.D. Tex. 2011), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ......................10

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
   726 F.3d 1359 (Fed. Cir. 2013)..............................................................................................3

*Octane Fitness LLC v. Icon Health & Fitness, Inc.*,
   No. 12-1184 (U.S.) (argued Feb. 26, 2014) ...........................................................................3

*Raylon, LLC v. Complus Data Innovations, Inc.*,
   700 F.3d 1361 (Fed. Cir. 2012).............................................................................................15

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
   No. 1:13–cv–158, 2013 WL 6327852 (E.D. Va. Dec. 3, 2013) .............................................10

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
   726 F.3d 1306 (Fed. Cir. 2013)..............................................................................................3

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011).......................................................................................9, 11

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)..............................................................................................11

**Statutes and Rules**

35 U.S.C. § 285.......................................................................................................................3, 11

Fed. R. Civ. P. 54(d)(2)(C) .........................................................................................................3

**Introduction**

This was an exceptional case because Stragent's claims were doomed from the start. Stragent acquired three network processor patents that the inventor believed covered Intel's network processors. But the technology in those processors predated the patents. So Stragent accused Intel's server processors instead. But that assertion was also futile because those products operate in a fundamentally different way from the network processors envisioned by the patents. No reasonable litigant could have expected success on the merits.

Stragent nevertheless proceeded with its claims in the apparent hope that the costs of litigation would coerce Intel into settling before the case reached a jury. Stragent is a habitual litigant that makes and sells no products. It has sued dozens of companies, all of whom have settled before trial. Intel is the first company to stand up to it. Instead of settling for less than the cost of defense, Intel put Stragent's claims to the test, and a jury rejected them in less than three hours (including lunch). But the vindication of Intel's rights did not come cheaply. Intel spent approximately $9 million defending its rights, costs that it should not have been forced to incur.

Stragent's supposed basis for filing suit was a document that disclosed a rolling CRC design that could not have infringed under Stragent's own reading of the patents. Moreover, although its expert determined early in the case that one of the patents was not infringed, Stragent waited until just before trial to give Intel a covenant not to sue on that patent. Likewise, it waited until the middle of trial to drop a second patent, even though it was not seeking an injunction or damages for that patent. At the very least, this was an exceptional case as to those two patents.

For the remaining patent, Stragent presented a baseless infringement theory. The asserted claims require an instruction indicating "*which* of the first and second circuits *is* to perform the CRC operation thereby providing *an* indicated circuit." Stragent argued that Intel's processors infringe on the theory that they have an instruction that indicates that "one or both" of the two

claimed CRC circuits are to perform the operation. That theory was contradicted not only by the singular claim language, but also by the specification, which left no doubt that the instruction must indicate that only *one* of the two claimed CRC circuits will perform the operation, not both. Nor could the invalidity verdict have surprised Stragent given that the inventor (who was conspicuously absent from trial) believed his patents covered the technology used in Intel's prior-art network processors.

Stragent's damages theory was equally baseless. Its expert constructed a hedonics regression model that produced the nonsensical result that 42% of the price of the accused processors was due to a bundle of the accused feature and 18 other features, none of which related to performance, speed, or scalability. The Court properly found that the expert's model was unreliable and that there were "significant doubts" about "even his capability to conduct such an analysis." Then, in contravention of the "entire market value" rule, Stragent sought $37 million in damages, which it described as "one penny" out of every dollar Intel made on the accused products.

Stragent also engaged in gamesmanship that unnecessarily increased Intel's costs before trial. For example, it asserted in an interrogatory response that the patents claimed priority to a provisional application, yet hid for a year that it was reading the asserted claims in a way incompatible with that application. It ultimately took more than 25 depositions of Intel witnesses, but used virtually none of them. It filed separate suits against Intel customers to coerce Intel into expanding the royalty base to include processors that Intel did not make or sell in the United States. It obstructed plainly necessary supplemental claim construction. And it waited to add one of the two patent claims that it ultimately took to trial until Intel could no longer seek *inter partes* reexamination of that claim.

Stragent tried every trick in the book—and even invented some new ones, such as using a ruse to add a local charity as a plaintiff—to pressure Intel. But Intel refused to yield. The Court

should declare this an exceptional case under 35 U.S.C. § 285. If the Court does so, then pursuant to Rule 54(d)(2)(C), Intel will document the value of services for which it seeks reimbursement (approximately $9 million).

**Argument**

### I.  ATTORNEYS' FEES MAY BE AWARDED BOTH FOR BASELESS CLAIMS AND FOR VEXATIOUS LITIGATION AND OTHER KINDS OF LITIGATION MISCONDUCT

Attorneys' fees may be awarded under 35 U.S.C. § 285 if (1) the prevailing party shows by clear and convincing evidence that the case is "exceptional" and (2) the Court decides an award is justified. *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915 (Fed. Cir. 2012).

"[T]he aim of § 285 is to compensate a defendant for attorneys' fees it should not have been forced to incur." *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013). "[M]any varieties of misconduct can support a district court's exceptional case finding, including lodging frivolous filings and engaging in vexatious or unjustified litigation." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011); *accord Kilopass*, 738 F.3d at 1317 (courts have "broad discretion" to find exceptionality in "a wide variety of circumstances"). Litigation misconduct may render a case exceptional without a showing of bad faith or baseless-ness. *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366-67 (Fed. Cir. 2013).

Even absent litigation misconduct, a case may be exceptional if it was objectively base-less and brought in bad faith. *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1326 (Fed. Cir. 2013). The objective prong is met if "'no reasonable litigant could reasonably expect success on the merits.'" *Id.* at 1327. For the subjective prong, "a defendant need only prove reckless conduct" based on "the totality of the circumstances." *Kilopass*, 738 F.3d at 1310-11.[1]

---

[1] The exceptionality of this case will be even clearer if the Supreme Court relaxes the standard in *Octane Fitness LLC v. Icon Health & Fitness, Inc.*, No. 12-1184 (U.S.) (argued Feb. 26, 2014).

## II.   STRAGENT'S CLAIMS WERE OBJECTIVELY BASELESS AND PURSUED IN BAD FAITH

### A.   Stragent's Liability Theory Was Objectively Baseless

#### 1.   Stragent Had No Basis for Filing Suit in the First Place

In explaining how Stragent came to sue Intel, Stragent's principal testified that Stragent's "big aha moment" came when it discovered "a patent application by [Intel's Debendra] das Sharma" regarding rolling CRC circuits that enabled Stragent to "connect the dots between this application and … Intel's server processors." [Tr.  299:3-300:2]

But that story could not be true because under Stragent's reading of the patents, the circuitry shown in the Das Sharma application [PTX 252] did not practice those patents. According to Stragent, the claims asserted in this case required two isolated CRC circuits and did not cover the use of multiple hardwired CRC polynomials sharing an output register or feedback path. [*See* Dkt. 247 at 8; Dkt. 278 Ex. 1 (Stone Tr.) 253:10-254:7; *id.* Ex. 3 (9/23/13 Stone Rebuttal Rpt.) ¶¶ 45, 60, 11; *id.* Ex. 10 (2/14/2014 Stone Supp. Rpt.) at 8-9; Dkt. 281 at 2][2] Yet the circuitry disclosed in the Das



**Fig. 5**

Sharma application had multiple hardwired CRC polynomials (212 and 216) that shared a single output register (218). Thus, according to Stragent's reading of the claims, the Das Sharma design had only a single CRC circuit and could not have given it a good-faith basis to pursue its case.

To make matters worse, Stragent hid this reading of those claims for a year. Back in January 2012, Stragent served an interrogatory response that the '072 patent claimed priority from provisional application No. 60/233,578. [Dkt. 219 Ex. C] The provisional described a single output register in the ALU that computed all CRC results. [DTX 141] In September 2013,

---

[2] Intel disagrees with that reading, but it was the basis on which Stragent tried the case.

Stragent served an amended response that omitted mention of the provisional application, without disclosing its theory that the shared output register meant the provisional conflicted with claims 12 and 16. [Counsel Decl. Ex. A] It was not until three weeks later that Intel learned of Stragent's position at the deposition of its expert Dr. Stone, who testified that he had come up with that undisclosed conclusion a year earlier. [Dkt. 219 Ex. B (Stone Tr.) 33:19-35:14][3]

## 2.  Stragent's Infringement Claims Were Baseless -- "Two" Is Not "One"

Stragent not only filed suit without a reasonable basis; it pursued an implausible infringement theory. The claims require not only multiple CRC circuits, but also a demultiplexer for receiving an instruction indicating "*which* of the first and second circuits *is* to perform the CRC operation thereby providing *an* indicated circuit" that would generate a CRC result. ['072(6:62-7:11) (emphasis added)] Stragent contended that the accused products' first CRC circuit is Generator A (Ga) and their second CRC circuit is Generator B (Gb). [Tr. 554:6-11] Stragent further asserted that the instruction occurs when a control flit during initialization communicates the chip's *ability* to operate in 8-bit CRC mode using Ga alone or in rolling 16-bit CRC mode using a combination of *both* Ga *and* Gb. [*Id.* at 508:23-509:14, 554:12-23, 556:19-22] That infringement theory was baseless because the language of the asserted claims and the specification leave no doubt that the instruction must indicate that *one* of the two claimed CRC circuits is to perform the claimed CRC operation, not both. Simply put, two is not one, and no reasonable litigant could argue otherwise.

The plain and ordinary meaning of the claim language makes clear that the instruction has to indicate that either the first circuit or the second circuit will perform the CRC operation, not both. The language does not recite "indicating whether the first CRC circuit, the second CRC

---

[3] This was not the first time Stragent had materially altered its professed understanding of the patents in response to prior art. After being informed in the *Freescale* litigation that it had accused prior-art processors, Stragent "refined" its infringement theory because it "now underst[oo]d that these products are outside a proper interpretation of the asserted claims." [No. 6:10-CV-224-LED-JDL Dkt. 75 at 2]

circuit, *or both* CRC circuits will perform the CRC operation thereby providing one or more indicated *circuits*" (plural). It uses the singular, requiring an indication of which one of the circuits "*is*" to perform the CRC operation, thereby providing "*an*" indicated "*circuit*" (singular).

The specification confirms that the instruction indicates and selects *one and only one* of multiple alternative CRC circuits. The Abstract states that "[t]he network processor includes a plurality of hardwired CRC polynomials that are used to implement the CRC operations" and that "[a] CRC instruction selects which polynomial [(singular)] to use when performing the CRC operation." The Summary of the Invention then confirms that "a selected *one* of the hardwired polynomials" is used to generate the CRC result. ['072(2:15-20) (emphasis added)]

The next paragraph specifically discusses the claim 12 embodiment and makes clear that the instruction results in "*one* of the first and second CRC circuits" performing the CRC operation. Mirroring the language of claim 12, it explains that "a demultiplexer receives an instruction indicating that the CRC operation is to be performed and *which of the first and second circuits is* to perform the CRC operation." ['072(2:29-33) (emphasis added)] The next sentence explains this means that the demultiplexer enables *one and only one* of the two CRC circuits to generate the CRC result: "The demultiplexer enables the indicated *one* of the first and second CRC circuits to generate a CRC output result based on the input data." ['072(2:33-35) (emphasis added)]

The "Detailed Description" of the invention says the same thing. The description accompanying Figure 3 (which Stragent agreed illustrated the claimed invention) starts by mirroring the "which … is" language of claim 12 and then confirms that the demultiplexer selects the "appropriate *one*" of the CRC circuits to perform the CRC operation. ['072(4:28-37); *see*



Fig. 3

*also* '072(5:37-42) (one "appropriate CRC circuit" (singular) "is" (singular) indicated for use for a particular CRC operation)]

### B.      Stragent Pursued Baseless Positions on Validity

Why did Stragent choose to make strained infringement allegations against Intel's server processors rather than accuse network processors, which were the focus of the patent? The most obvious explanation is that Intel's network processors were invalidating prior art. The inventor testified at deposition that he had previously identified Intel's IXP network processors as infringing and therefore assumed that Stragent was accusing those products. [Tr. 204:14-21] In particular, he had reviewed documentation for Intel's IXP2800 network processor ("Castine"), and "lo and behold, it appeared that the IXP2800 infringed on the patent." [*Id.* at 204:24-205:5] But the CRC functionality used in the IXP2800 had been carried forward from an earlier Intel network processor, the IXP1250/1240 ("Hyannis"), which is undisputedly prior art. [Tr. 881:4-17; Dkt. 327 at 11]

But there was more. Until trial, Stragent argued that the prior-art chips (Hyannis, Hydrogen, and Monsoon) did not include parallel decompositions because although they could process large network protocol packets 32 bits at a time, claim 16 requires all the packet data to be input to the CRC circuit at once. [Tr. 1447:5-1449:3] Stragent's position was implausible. It depended on reading "parallel decomposition" to exclude the disclosed embodiments and on contradicting the inventor's own description of his invention. ['072(4:46) ("input CRC data is four bytes [*i.e.*, 32 bits]"); DTX 141 at STRAG_00001500 ("The ALU functional unit performs 32-bit, 1- and 2- operand arithmetic, logic, and special functions on its two input ports, and puts the result in its single register"); DTX 159 (referring to 32-bit calculation as a parallel decomposition of a serial calculation that would require 32 clock ticks)]

Moreover, that interpretation of claim 16 makes no sense for network processors that

handle large packets, which the title and abstract of the patent make clear were the focus of the invention. Further, Stragent concealed that theory until after completion of the initial claims construction and the onset of expert discovery. When it finally revealed its position, it embarked on a campaign to prevent resolution of the obvious claim construction dispute on which its theory was based. [*See, e.g.,* Dkt. 281 at 1] Not until the last day of trial did Stragent and Dr. Stone concede that under the supplemental claim constructions, the prior-art chips included CRC circuits that satisfied the parallel decomposition requirement. [Tr. 1448:17-1450:3]

## C.    Stragent's Damages Theory Was Also Frivolous

Stragent ignored its duty to establish "sound economic and factual predicates" for its exorbitant damages request. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (internal quotations and citation omitted). [*See* Dkt. 318 (Intel's JMOL on Damages)] Stragent's economic alchemy purported to convert $100,000 and $350,000 nuisance settlements into a $37,000,000 windfall. Yet in *Lucent*, the Federal Circuit found "little evidentiary basis … for awarding roughly three to four times the average amount in the lump-sum agreements in evidence." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009). Here, resting on an even slimmer reed, Stragent sought lump-sum damages that were a whopping *150 times* the average of the Freescale and Lattice nuisance settlements.

### 1.    Stragent Tried to Rely on a Bogus Hedonic Regression Model

Stragent's damages expert, Dr. Vellturo, constructed a hedonics regression model that absurdly suggested that a bundle of 19 Reliability, Availability and Serviceability (RAS) features including the accused feature accounted for 42% of the price of the accused processors. Dr. Vellturo acknowledged that his model could not go further and isolate the value of the accused feature. Instead, he simply divided the 42% estimate by 19 and concluded that the accused feature accounted for 2.2% of the price of the accused processors. [Dkt. 289 at 6]

As this Court held, Dr. Vellturo's model was facially unreliable because he failed to explain his selection of variables. [Dkt. 314 at 2-4] Indeed, there were "significant doubts" about "even his capability to conduct such analysis." [*Id.*] Moreover, even if his model had been reliable, "Dr. Vellturo's attribution of equal value to all 19 RAS features [was] not based on any theory that me[t] the *Daubert* criteria of verifiability, peer review or publication, an acceptable error rate, or general acceptance in the scientific community." [Dkt. 289 at 7] Those findings made it unnecessary for the Court to reach numerous other defects of the analysis, such as omitted data, dropped product features, and facially unreasonable results. *See MarcTec*, 664 F.3d at 920 (submission of expert testimony that did not meet the *Daubert* requirements supported exceptionality).

## 2.     Stragent's Damages Theory Violated the Entire Market Value Rule

With its hedonics model thrown out, Stragent presented a theory based on the entire market value of the accused processors. It multiplied Intel's total accused revenues by the 1.18% rate that Dr. Vellturo imputed from the Freescale settlement. Stragent told the jury that "Intel has made $3.5 billion selling computer chips that use these patents" and that Intel should have to pay Stragent $37 million. [Tr. 105:20-106:13, 1589:12-18] Stragent twice illustrated its point with a cup of 100 pennies, saying that it should receive one penny out of every dollar Intel had made from the accused products. [*Id.* 105:10-19, 1589:12-1590:8]

It is a basic principle of patent damages that to rely on the entire market value of the accused product, the patentee must establish that the invention drives demand for that product. Otherwise, the patentee must apportion the royalty base to reflect the relative value of the patented feature. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). As the Court instructed the jury here, "if the value of the accused product is based on many features, including other technical features or patented technologies unrelated to the claimed invention,

you may award damages only based on the value of the claimed invention." [Tr. 1529:16-23] Yet Dr. Vellturo neither claimed that the accused feature drove demand for the processors nor apportioned the royalty base despite acknowledging that "these are complicated devices," that "there are lots of things that go into it," and that Intel "contributed enormously to the profit of their products." [Tr. 614:18-615:5, 672:10-17, 758:18-24][4]

Stragent suggested that it was not violating the Court's jury instruction and the entire market value rule because Dr. Vellturo was using "the smallest saleable unit." [*Id.* 776:9-17] But as many courts have noted, that logic is "fundamentally flawed." *Dynetix Design Solutions, Inc., v. Synopsys, Inc.*, No. C 11–05973 PSG, 2013 WL 4538210, at *3-4 (N.D. Cal. Aug. 22, 2013) ("*LaserDynamics* supports the premise that an apportionment is required even where … the accused product is the smallest salable unit"); *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 726 (E.D. Tex. 2011) (a patentee cannot discharge its duty to apportion by limiting the royalty base to the "smallest saleable unit"), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, No. 1:13–cv–158, 2013 WL 6327852, at *5 (E.D. Va. Dec. 3, 2013) ("the Federal Circuit has not held 'that no further apportionment is ever necessary once the smallest salable unit is determined'") (citation omitted). Indeed, another patentee was recently barred from basing its royalty on the entire value of accused Intel processors. *AVM Techs., LLC v. Intel Corp.*, Civ. A. No. 10–610–RGA, 2013 WL 126233, at *3 (D. Del. Jan. 4, 2013).

Dr. Vellturo further contended that his 1.18% royalty rate was itself an "apportionment" that "identif[ied] the contributory value of this invention." [Tr. 748:9-749:16] But "Supreme Court and [Federal Circuit] precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate."

---

[4] Dr. Vellturo also improperly relied on documents allegedly showing the accused feature's "priority" rank. [Tr. 620:25-624:14] The Court had previously found that "[t]hose documents do not suggest that the priority ratings are based on the features' relative contributions to product prices." [Dkt. 289 at 8-9]

*Uniloc*, 632 F.3d at 1319-20 (adjusting the royalty rate does not cure the prejudice of presenting the defendant's total revenues, which "cannot help but skew the damages horizon for the jury").

In any event, Dr. Vellturo made no attempt to show that his 1.18% rate "identif[ied] the contributory value of this invention." That rate was based on imputing a running royalty rate from the Freescale settlement. Putting aside the impropriety of converting that lump sum into a running royalty rate [*see, e.g., LaserDynamics,* 694 F.3d at 79-80], Dr. Vellturo never demonstrated that the patent had the same relative value to Freescale's $2.50 semiconductors and Intel's $2,000 server processors. The Federal Circuit has "stressed that comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010). Dr. Vellturo did not even try to do so.

### D.      Stragent Conduct Meets the Standard for "Exceptional" Cases

Stragent brought this case without a valid basis and then continued to pursue it even after no reasonable litigant could reasonably expect to prevail. *See MarcTec*, 664 F.3d at 916 (a finding of exceptionality may be appropriate where the patentee "'prolongs litigation in bad faith'"). It compounded the problem with a damages theory that no reasonable litigant would consider justified under Federal Circuit law. The "[o]bjective baselessness [of Stragent's claims] alone … create[s] a sufficient inference of bad faith to establish exceptionality under § 285." *Kilopass*, 738 F.3d at 1314. At the very least, Stragent was reckless. *See id.* at 1310.

What is more, as the Federal Circuit has recognized, a finding of bad faith is justified where the patentee has "exploit[ed] the high cost to defend complex litigation to extract a nuisance value settlement." *Eon-Net*, 653 F.3d at 1327. Like the plaintiff in *Eon-Net*, Stragent has a history of suing companies and settling before trial. [Counsel Decl. Ex. B] Those settlements have "effectively ensured that [Stragent's] baseless infringement allegations

remained unexposed." *Eon-Net*, 653 F.3d at 1327. Moreover, Stragent "impose[d] disproportionate discovery costs on [Intel]." *Id.* While producing only about 60,000 pages itself, Strangent's discovery demands required Intel to produce over 800,000 pages, of which Stragent used less than 0.5% at trial. [Counsel Decl. ¶ 5] In addition, Stragent took more than 25 depositions of Intel employees, totaling over 80 hours, yet it used only 19 minutes from a single one of those depositions during its affirmative case. [*Id.* ¶ 6; Tr. 266:10-14] Meanwhile, Stragent "placed little at risk when filing suit" because "[a]s a non-practicing entity, [it] was generally immune to counterclaims" and it "did not face any business risk resulting from the loss of patent protection over a product or process." *Eon-Net*, 653 F.3d at 1327-28.

## III.   STRAGENT ENGAGED IN LITIGATION MISCONDUCT

In the words of *MarcTec*, 664 F.3d at 920-21:

> [Stragent] not only initiated a frivolous lawsuit, it persisted in advancing unfounded arguments that unnecessarily extended this litigation and caused [Intel] to incur needless litigation expenses. This vexatious conduct is, by definition, litigation misconduct, and provides a separate and independent basis supporting [a] determination that this case is exceptional.

### A.   Stragent Used a Ruse to Join a Local Charity as a Co-Plaintiff

Stragent's misconduct began before it even filed suit. Shortly after purporting to assign the patents to a local charity, Stragent took back the exclusive right to practice, license, and enforce the patents. [Dkt. 102 Exs. 1 & 2] Stragent and the charity filed their first suit the following week and sued Intel a year later. The purported "assignment" and immediate grant-back license were a litigation-oriented gimmick. As the Court ruled, the charity had no right to enforce the patents, no right to control this lawsuit, no right to decide whether to be a party, no rights to make, use or sell the claimed inventions, and no right to license anyone else. [Dkt. 288] Why would Stragent engage in such an elaborate ploy? Because it apparently believed the presence of a sympathetic local charity would sway the jury and add pressure on Intel to settle for reasons

unrelated to the merits.

**B.     Stragent Asserted the '244 Patent Even Though It Sought Neither an Injunction Nor Damages for Intel's Alleged Infringement of that Patent**

The only asserted claim of the '244 patent was a method claim, which Stragent contended Intel infringed by its internal use of servers that incorporated accused processors. [Dkt. 247 at 13] But Stragent never provided a damages theory based on that use or sought an injunction. [Tr. 9:1-10, 797:2-17] Nevertheless, Stragent continued to assert the '244 patent until the fourth day of trial [*id.* 1077:14-18], and Intel incurred the needless costs of defending it.

**C.     Stragent Continued to Assert Some Patents and Claims Even After Its Expert Had Determined that Intel Did Not Infringe Them**

According to Stragent, Dr. Stone determined that Intel did not infringe the '102 patent when he reviewed the source code, and Stragent "immediately dropped" the '102 patent and "very promptly" told the Court that Intel did not infringe. [Tr. 290:23-291:18] But the facts show otherwise. Dr. Stone reviewed Intel's source code in July 2012. [Counsel Decl. Ex. C] Yet Stragent continued to assert the '102 patent in its December 2012 amended complaint. [Dkt. 71] Not until August 2013 did Stragent file a stipulation limiting the case to the '072 and '244 patents, and not until February 2014 did it finally provide Intel with a covenant not to sue on the '102 patent. [Dkt. 133, 265]

Stragent's conduct regarding claims 3 and 4 of the '244 patent was equally dilatory. Dr. Stone testified in October 2013 that the accused Intel products did not infringe those claims. [Dkt. 278 Ex. 1 (Stone Tr.) 171-72] Yet Stragent did not confirm that it was no longer asserting them until a month before trial. [Counsel Decl. Ex. D] *See IA Labs CA, LLC v. Nintendo Co.*, Civ. No. PJM 10-833, 2012 WL 1565296, at *3 (D. Md. May 1, 2012) (the fact that patentee waited two months to disclose that it would abandon a claim and then four more months to actually do so was "evidence of bad faith").

### D.      Stragent Obstructed the Claim Construction Process

Faced with dead-on anticipatory art, Stragent and Dr. Stone schemed to develop claim constructions that would avoid anticipation, including theories that the claimed CRC circuits could not overlap and that "input data" and "parallel decomposition" had to span an entire packet of data. They did not disclose those interpretations until September 2013, however, and then fought Intel's repeated efforts to have the new claim construction issues resolved. [*See* Dkt. 196 at 8-9] As a result, the additional claims were not construed until the eve of trial. [Dkt. 294] The Court observed at trial that Stragent was "responsible entirely for the delay in the claim construction." [Tr. 492:16-21] *See Eon-Net*, 653 F.3d at 1325 (patentee's "failure to engage the claim construction process in good faith" constituted litigation misconduct).

### E.      Stragent Waited Until Intel's Time to Seek *Inter Partes* Reexamination Had Expired Before Asserting Claim 16 of the '072 Patent

All the claims that Stragent initially asserted in this case have been rejected in *inter partes* reexaminations, leading to Actions Closing Prosecution. [Counsel Decl. Exs. E-G] The reexaminations did not include claim 16 of the '072 patent, however, because Stragent did not assert that claim until the one-year deadline had passed.[5] And in conduct reminiscent of its obstruction of claim construction, Stragent filed *eight* petitions to reopen the *inter partes* cases to delay invalidation of the claims until after trial. All eight have been denied. [Counsel Decl. Exs. H-J]

### F.      Stragent Filed Separate Suits Against Intel's Customers to Pressure Intel into Agreeing to Include Non-U.S. Processors into the Royalty Base

After having asserted indirect infringement for two years, Stragent suddenly dropped its indirect infringement claims in August 2013. [Counsel Decl. Ex. K] But Stragent was not trying

---

[5] Unable to petition for *inter partes* reexamination of claim 16, Intel filed a petition for *ex parte* reexamination. Notably, Stragent sought to add 64 new claims in that later *ex parte* proceeding rather than in the *inter partes* reexamination of the other claims of the '072 patent. The PTO has rejected all of those claims in a final office action. [Counsel Decl. Ex. L]

to narrow the case. Instead, the abandonment of those claims was part of a strategy to ratchet up the pressure on Intel by opening a new front. Just days later, it filed suit against three of Intel's largest customers for the accused products: Cisco, No. 6:13-cv-608 (Aug. 26, 2013), Dell, No. 6:13-cv-609 (Aug. 26, 2013), and Hewlett-Packard, No. 6:13-cv-610 (Aug. 26, 2013). Stragent then used those suits to coerce Intel into agreeing that the royalty base in this case would include accused processors that were not manufactured or sold by Intel in the United States. [Dkt. 161 Ex. 1 ¶¶ 3-5, 9] Stragent's apparent goal was to try to collect a royalty on those products without having to establish indirect infringement. This was just one more turn of the screw by Stragent to force settlement before a jury could expose the baselessness of its claims. But this one failed too.

## Conclusion

Stragent brought objectively baseless claims in bad faith. Its patents were invalid over Intel's own prior-art networking processors, and it accused server processors that operate in a fundamentally different way than claimed by the patents. Stragent engaged in a wide range of improper litigation tactics that increased the costs and risks to Intel of vindicating its rights. The Court should find that this case is "exceptional" and award Intel its reasonable attorneys' fees and nontaxable costs. Such a determination is necessary to "compensate [Intel] for attorneys' fees it should not have been forced to incur" and to deter "clearly unwarranted suits" in the future. *Kilopass*, 738 F.3d at 1313; *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1372 (Fed. Cir. 2012) (internal quotations and citation omitted).

Dated: April 10, 2014

Respectfully submitted,

*/s/Chad S. Campbell, with permission by*
*Michael E. Jones*
Michael E. Jones
  mikejones@potterminton.com
John Bufe
  johnbufe@potterminton.com
Allen Gardner
  allengardner@potterminton.com
POTTER MINTON
110 North College Avenue, Suite 500
Tyler, Texas 75702
Tel.: (903) 597-8311
Fax : (903) 593-0846

Chad S. Campbell
  cscampbell@perkinscoie.com
Timothy J. Franks
  tfranks@perkinscoie.com
Aaron H. Matz
  amatz@perkinscoie.com
Tyler R. Bowen
  tbowen@perkinscoie.com
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Tel.: (602) 351-8393
Fax: (602) 648-7193

David J. Burman
  dburman@perkinscoie.com
Michael D. Broaddus
  mbroaddus@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, 48th Floor
Seattle, Washington 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Robert Christopher Bunt
  rcbunt@pbatyler.com
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Tel.: (903) 531-3535
Fax: (903) 533-9687

Attorneys for Intel Corporation

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 10, 2014.

*/s/ Michael E. Jones*

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that counsel for Defendants has complied with the meet and confer requirement in Local Rule CV-7(h). The personal conference required by Local Rule CV-7(h) was conducted on April 10, 2014 via telephone conference between counsel for Plaintiff and Defendant. This motion is opposed.

*/s/ Michael E. Jones*