**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **STRAGENT, LLC, ET AL.,** | § | |
| | § | |
| *Plaintiffs*, | § | **CIV. ACTION NO. 6:11-CV-421-TBD-** |
| | § | **JDL** |
| **v.** | § | |
| | § | |
| **INTEL CORPORATION,** | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**INTEL'S AMENDED MOTION TO RECOVER ATTORNEYS' FEES**

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Argument ..................................................................................................................... 3

    I.      Attorneys' Fees May Be Awarded in Cases That Stand Out From Others .......... 3

    II.    Stragent's Substantive Claims Were Exceptionally Weak .................................... 3

        A.      Stragent's Liability Theory Was Exceptionally Weak ............................. 3

            1.      Stragent Had No Basis for Filing Suit ........................................... 3

            2.      Stragent's Infringement Claims Were Implausible, as Two Is Not One ...................................................................................... 5

        B.      Stragent Pursued Baseless Validity Positions ........................................... 6

        C.      Stragent's Damages Theory Was Exceptionally Weak ............................. 8

            1.      Stragent Relied on an Exceptionally Meritless Damages Model ............................................................................................. 8

            2.      Stragent's Damages Theory Violated the Entire Market Value Rule ...................................................................................... 9

    III.   Stragent Litigated the Case in an Unreasonable Manner .................................... 11

        A.      Stragent's Ruse to Join a Local Charity as a Co-Plaintiff ...................... 11

        B.      Stragent's Assertion of a Patent for Which It Sought No Remedy.......... 11

        C.      Stragent Continued to Assert Patents and Claims Even After Its Expert Had Determined that Intel Did Not Infringe Them ...................... 12

        D.      Stragent Obstructed the Claim Construction Process .............................. 12

        E.      Stragent Waited Until Intel's Time to Seek Inter Partes Reexamination Had Expired Before Asserting Claim 16 of the '072 Patent ............................................................................................. 13

        F.      Stragent Engaged in Unreasonable Discovery......................................... 13

        G.      Stragent Filed Separate Suits Against Intel's Customers to Pressure Intel into Agreeing to Include Non-U.S. Processors into the Royalty Base ........................................................................................... 14

    IV.   An Award of Fees Would Advance the Purposes of Section 285 ....................... 14

Conclusion ................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AVM Techs., LLC v. Intel Corp.*,
   Civ. A. No. 10–610–RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013)......................................10

*Dynetix Design Solutions, Inc., v. Synopsys, Inc.*,
   No. C 11–05973 PSG, 2013 WL 4538210 (N.D. Cal. Aug. 22, 2013)..................................10

*Eagle Servs. Corp. v. H2O Indus. Servs., Inc.*,
   532 F.3d 620 (7th Cir. 2008) ......................................................................................12, 15

*Eon-Net LP v. Flagstar Bancorp*,
   653 F.3d 1314 (Fed. Cir. 2011)...........................................................................13, 14, 15

*Fogerty v. Fantasy, Inc.*
   510 U.S. 517 (1994)..............................................................................................3, 14, 15

*IA Labs CA, LLC v. Nintendo Co.*,
   Civ. No. PJM 10-833, 2012 WL 1565296 (D. Md. May 1, 2012) .........................................12

*Kilopass Tech., Inc. v. Sidense Corp.*,
   738 F.3d 1302 (Fed. Cir. 2013)..............................................................................................14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)................................................................................8, 10, 11

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)..............................................................................................8

*MarcTec, LLC v. Johnson & Johnson*,
   664 F.3d 907 (Fed. Cir. 2012)................................................................................................9

*Mattel, Inc. v. MGA Entertainment, Inc.*,
   705 F.3d 1108 (9th Cir. 2013) .............................................................................................15

*Mirror Worlds, LLC v. Apple, Inc.*,
   784 F. Supp. 2d 703 (E.D. Tex. 2011), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ......................10

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
   No. 12-1184, slip op. (U.S. Apr. 29, 2014)................................................................3, 14, 15

*Raylon, LLC v. Complus Data Innovations, Inc.*,
   700 F.3d 1361 (Fed. Cir. 2012).............................................................................................14

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
   No. 1:13–cv–158, 2013 WL 6327852 (E.D. Va. Dec. 3, 2013) .............................................10

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011).........................................................................................9, 10

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010).............................................................................................11

**Statutes and Rules**

35 U.S.C. § 285.............................................................................................................................3, 15

Fed. R. Civ. P. 54(d)(2)(C) ..........................................................................................................3, 15

**Introduction**

This was an exceptional case under the standard now clarified by the Supreme Court because Stragent's claims were doomed from the start. Stragent acquired three network processor patents that the inventor believed covered Intel's network processors. But the technology in those processors predated the patents, so Stragent accused Intel's server chips instead. But that assertion was also futile because those products operate in a fundamentally different way from the network processors envisioned by the patents.

Stragent nevertheless proceeded with its claims in the apparent hope that the costs of litigation would coerce Intel into settling before the case reached a jury. Stragent is a habitual litigant that makes and sells no products. It has sued dozens of companies, all of which have settled before trial. Intel is the first company to stand up to it. Instead of settling for less than the cost of defense, Intel put Stragent's claims to the test, and a jury rejected them in less than three hours (including lunch). The invalidity verdicts vindicated not only Intel's rights, but also those of the general public by putting the claimed inventions in the public domain. But the vindication of those rights did not come cheaply. Intel spent approximately $9 million in legal costs that it should not have been forced to incur.

Stragent's supposed basis for filing suit was a document that disclosed a rolling CRC design that could not have infringed under Stragent's own reading of the patents. Moreover, although its expert determined early in the case that one of the patents was not infringed, Stragent waited until just before trial to give Intel a covenant not to sue on that patent. Likewise, it waited until the middle of trial to drop a second patent, even though it was not seeking an injunction or damages for that patent. At the very least, this was an exceptional case as to those two patents.

For the remaining patent, Stragent presented a baseless infringement theory. The asserted claims require an instruction indicating "*which* of the first and second circuits *is* to perform the

CRC operation thereby providing *an* indicated circuit." Stragent argued that Intel's processors infringe on the theory that they have an instruction that indicates that "one or both" of the two claimed CRC circuits are to perform the operation. That theory was contradicted not only by the singular claim language, but also by the specification, which left no doubt that the instruction must indicate that only *one* of the two claimed CRC circuits will perform the operation, not both. Nor could the invalidity verdict have surprised Stragent given that the inventor (who was conspicuously absent from trial) believed his patents covered the technology used in Intel's prior-art network processors.

Stragent's damages theory was equally baseless. Its expert constructed a hedonics regression model that produced the nonsensical result that 42% of the price of the accused processors was due to a bundle of the accused feature and 18 other features, none of which related to performance, speed, or scalability. The Court properly found that the expert's model was unreliable and that there were "significant doubts" about "even his capability to conduct such an analysis." Then, in contravention of the "entire market value" rule, Stragent sought $37 million in damages, which it described as "one penny" out of every dollar Intel made on the accused products.

Stragent also engaged in gamesmanship that unnecessarily increased Intel's costs before trial. For example, it asserted in an interrogatory response that the patents claimed priority to a provisional application, yet hid for a year that it was reading the asserted claims in a way incompatible with that application. It ultimately took more than 25 depositions of Intel witnesses, but used virtually none of them. It filed separate suits against Intel customers to coerce Intel into expanding the royalty base to include processors that Intel did not make or sell in the United States. It obstructed plainly necessary supplemental claim construction. And it waited to add one of the two patent claims that it ultimately took to trial until Intel could no longer seek *inter partes* reexamination of that claim.

Stragent tried every trick in the book—and even invented some new ones, such as using a ruse to add a local charity as a plaintiff—to pressure Intel. But Intel refused to yield. The Court should declare this case exceptional under 35 U.S.C. § 285. If it does so, Intel will document the approximately $9 million for which it seeks reimbursement, as provided by Fed. R. Civ. P. 54(d)(2)(C).

**Argument**

## I.   ATTORNEYS' FEES MAY BE AWARDED IN CASES THAT STAND OUT FROM OTHERS

Attorneys' fees may be awarded in "exceptional" cases. 35 U.S.C. § 285. As the Supreme Court has just instructed, a case is "exceptional" if it "stands out from others with respect to the substantive strength of a party's litigating position … or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, No. 12-1184, slip op. 7-8 (U.S. Apr. 29, 2014). The trial court is to use its equitable discretion on a case-by-case basis, "considering the totality of the circumstances." *Id.* at 8. Among the non-exclusive factors that the Court may consider are "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 8 n.6 (quoting *Fogerty v. Fantasy, Inc.* 510 U.S. 517, 534 n.19 (1994)). Sanctionable conduct "is not the appropriate benchmark." *Id.* at 9. Section 285 "imposes no specific evidentiary burden, much less such a high one [as clear and convincing evidence]." *Id.* at 11.

## II.   STRAGENT'S SUBSTANTIVE CLAIMS WERE EXCEPTIONALLY WEAK

### A.   Stragent's Liability Theory Was Exceptionally Weak

#### 1.   Stragent Had No Basis for Filing Suit

In explaining how Stragent came to sue Intel, Stragent's principal, Mr. Zilka, testified that Stragent's "big aha moment" came when it discovered "a patent application by [Intel's

Debendra] das Sharma" regarding rolling CRC circuits that enabled Stragent to "connect the dots between this application and … Intel's server processors." [Tr. 299:3-300:2]

But that story could not be true because under Stragent's reading of the patents, the circuitry shown in the Das Sharma application [PTX 252] did not practice those patents. According to Stragent, the claims asserted in this case required two isolated CRC circuits and did not cover the use of multiple hardwired CRC polynomials sharing an output register or feedback path. [*See* Dkt. 247 at 8; Dkt. 278 Ex. 1 (Stone Tr.) 253:10-254:7; *id.* Ex. 3 (9/23/13 Stone Rebuttal Rpt.) ¶¶ 45, 60, 11; *id.* Ex. 10 (2/14/2014 Stone Supp. Rpt.) at 8-9; Dkt. 281 at 2][1] Yet the circuitry disclosed in the Das



**Fig. 5**

Sharma application had multiple hardwired CRC polynomials (212 and 216) that shared a single output register (218). Thus, according to Stragent's reading of the claims, the Das Sharma design had only a single CRC circuit and could not have given it a good-faith basis to pursue its case.

To make matters worse, Stragent hid this reading of those claims for a year. Back in January 2012, Stragent served an interrogatory response that the '072 patent claimed priority from provisional application No. 60/233,578. [Dkt. 219 Ex. C] The provisional described a single output register in the ALU that computed all CRC results. [DTX 141] In September 2013, Stragent served an amended response that omitted mention of the provisional application, without disclosing its theory that the shared output register meant the provisional conflicted with claims 12 and 16. [Dkt. 346 Ex. A] It was not until three weeks later that Intel learned of Stragent's position at the deposition of its expert Dr. Stone, who testified that he had come up

---

[1] Intel disagrees with that reading, but it was the basis on which Stragent tried the case.

with that undisclosed conclusion a year earlier. [Dkt. 219 Ex. B (Stone Tr.) 33:19-35:14][2]

### 2. Stragent's Infringement Claims Were Implausible, as Two Is Not One

Stragent not only filed suit without a reasonable basis; it pursued an implausible infringe-ment theory. In addition to multiple CRC circuits, the claims required a demultiplexer for receiving an instruction indicating "*which* of the first and second circuits *is* to perform the CRC operation thereby providing *an* indicated circuit" that would generate a CRC result. ['072(6:62-7:11) (emphasis added)] Stragent contended that the accused products' first CRC circuit was Generator A (Ga) and their second CRC circuit was Generator B (Gb). [Tr. 554:6-11] Stragent further asserted that the instruction occurred when a control flit during initialization communi-cated the chip's *ability* to operate in 8-bit CRC mode using Ga alone or in rolling 16-bit CRC mode using a combination of *both* Ga *and* Gb. [*Id.* at 508:23-509:14, 554:12-23, 556:19-22] That infringement theory was baseless because the language of the asserted claims and the specification left no doubt that the instruction had to indicate that *one* of the two claimed CRC circuits is to perform the claimed CRC operation, not both. Simply put, two is not one, and no reasonable litigant could argue otherwise.

The plain and ordinary meaning of the claim language made clear that the instruction had to indicate that either the first circuit or the second circuit will perform the CRC operation, not both. The language did not recite "indicating whether the first CRC circuit, the second CRC cir-cuit, *or both* CRC circuits will perform the CRC operation thereby providing one or more indi-cated *circuits*" (plural). It used the singular, requiring an indication of which one of the circuits "*is*" to perform the CRC operation, thereby providing "*an*" indicated "*circuit*" (singular).

The specification confirmed that the instruction must indicate and select *one and only one*

---

[2] This was not the first time that Stragent materially altered its professed understanding of the patents in response to prior art. After being informed in the *Freescale* litigation that it had accused prior-art processors, Stragent "refined" its infringement theory because it "now underst[oo]d that these products are outside a proper interpretation of the asserted claims." [No. 6:10-CV-224-LED-JDL Dkt. 75 at 2]

of multiple alternative CRC circuits. The Abstract stated that "[t]he network processor includes a plurality of hardwired CRC polynomials that are used to implement the CRC operations" and that "[a] CRC instruction selects which polynomial [(singular)] to use when performing the CRC operation." The Summary of the Invention then confirmed that "a selected *one* of the hardwired polynomials" is used to generate the CRC result. ['072(2:15-20) (emphasis added)]

The next paragraph specifically discussed the claim 12 embodiment and made clear that the instruction results in "*one* of the first and second CRC circuits" performing the CRC operation. Mirroring claim 12's terms, it explained that "a demultiplexer receives an instruction indicating that the CRC operation is to be performed and *which of the first and second circuits is* to perform the CRC operation." ['072(2:29-33) (emphasis added)] The next sentence explained this means that the demultiplexer enables *one and only one* of the two CRC circuits to generate the CRC result: "The demultiplexer enables the indicated *one* of the first and second CRC circuits to generate a CRC output result based on the input data." ['072(2:33-35) (emphasis added)]

The "Detailed Description" said the same thing. The description accompanying Figure 3 (which Stragent agreed illustrated the claimed invention) started by mirroring claim 12's "which … is" language and then confirmed that the demultiplexer selects the "appropriate *one*" of the CRC



Fig. 3

circuits to perform the CRC operation. ['072(4:28-37); *see also* '072(5:37-42) (one "appropriate CRC circuit" (singular) "is" (singular) indicated for use for a particular CRC operation)]

**B.      Stragent Pursued Baseless Validity Positions**

The apparent reason that Stragent chose to make strained infringement allegations against Intel's server processors (rather than network processors, which were the focus of the patent) is

that Intel's network processors were invalidating prior art. The inventor testified at deposition that he had previously identified Intel's IXP network processors as infringing and therefore assumed that Stragent was accusing those products. [Tr. 204:14-21] In particular, he had reviewed documentation for Intel's IXP2800 network processor ("Castine"), and "lo and behold, it appeared that the IXP2800 infringed on the patent." [*Id*. at 204:24-205:5] But the CRC functionality used in the IXP2800 had been carried forward from an earlier Intel network processor, the IXP1250/1240 ("Hyannis"), which was undisputedly prior art. [Tr. 881:4-17; Dkt. 327 at 11]

But there was more. Until trial, Stragent argued that the prior-art chips (Hyannis, Hydrogen, and Monsoon) did not include "parallel decompositions" because although they could process large network protocol packets 32 bits at a time, claim 16 required all the packet data to be input to the CRC circuit at once. [Tr. 1447:5-1449:3] Stragent's position was implausible. It depended on reading "parallel decomposition" to exclude the disclosed embodiments and on contradicting the inventor's own description of his invention. ['072(4:46) ("input CRC data is four bytes [*i.e.*, 32 bits]"); DTX 141 at STRAG_00001500 ("The ALU functional unit performs 32-bit, 1- and 2- operand arithmetic, logic, and special functions on its two input ports, and puts the result in its single register"); DTX 159 (referring to 32-bit calculation as a parallel decomposition of a serial calculation that would require 32 clock ticks)]

Moreover, that interpretation of claim 16 made no sense for network processors that handle large packets, which the title and abstract of the patent make clear were the focus of the invention. Further, Stragent concealed that theory until after completion of the initial claims construction and the onset of expert discovery. When it finally revealed its position, it embarked on a campaign to prevent resolution of the obvious claim construction dispute on which its theory turned. [*See, e.g.,* Dkt. 281 at 1] Not until the last day of trial did Stragent and Dr. Stone concede that under the supplemental claim constructions, the prior-art chips included CRC

circuits that satisfied the parallel decomposition requirement. [Tr. 1448:17-1450:3]

### C.    Stragent's Damages Theory Was Exceptionally Weak

Stragent ignored its duty to establish "sound economic and factual predicates" for its exorbitant damages request. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (internal quotations and citation omitted). [*See* Dkt. 318 (Intel's JMOL on Damages)] Stragent's economic alchemy purported to convert $100,000 and $350,000 nuisance settlements into a $37,000,000 windfall. Yet in *Lucent*, the Federal Circuit found "little evidentiary basis … for awarding roughly three to four times the average amount in the lump-sum agreements in evidence." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009). Here, resting on an even slimmer reed, Stragent sought lump-sum damages that were a whopping *150 times* the average of the Freescale and Lattice nuisance settlements.

### 1.    Stragent Relied on an Exceptionally Meritless Damages Model

Stragent's damages expert, Dr. Vellturo, constructed a hedonics regression model that absurdly suggested that a bundle of 19 Reliability, Availability and Serviceability (RAS) features including the accused feature accounted for 42% of the price of the accused processors. Dr. Vellturo acknowledged that his model could not go further and isolate the value of the accused feature. Instead, he simply divided the 42% estimate by 19 and concluded that the accused feature accounted for 2.2% of the price of the accused processors. [Dkt. 289 at 6]

As this Court held, Dr. Vellturo's model was facially unreliable because he failed to explain his selection of variables. [Dkt. 314 at 2-4] Indeed, there were "significant doubts" about "even his capability to conduct such analysis." [*Id.*] Moreover, even if his model had been reliable, "Dr. Vellturo's attribution of equal value to all 19 RAS features [was] not based on any theory that me[t] the *Daubert* criteria of verifiability, peer review or publication, an acceptable error rate, or general acceptance in the scientific community." [Dkt. 289 at 7] Those findings

made it unnecessary for the Court to reach numerous other defects of the analysis, such as omitted data, dropped product features, and facially unreasonable results. *See MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 920 (Fed. Cir. 2012) (submission of expert testimony that did not meet the *Daubert* requirements supported exceptionality).

### 2.      Stragent's Damages Theory Violated the Entire Market Value Rule

With its hedonics model thrown out, Stragent presented a theory based on the entire market value of the accused processors. It multiplied Intel's total accused revenues by the 1.18% rate that Dr. Vellturo imputed from the Freescale settlement. Stragent told the jury that "Intel has made $3.5 billion selling computer chips that use these patents" and that Intel should have to pay Stragent $37 million. [Tr. 105:20-106:13, 1589:12-18] Stragent twice illustrated its point with a cup of 100 pennies, saying that it should receive one penny out of every dollar Intel had made from the accused products. [*Id.* 105:10-19, 1589:12-1590:8]

It is a basic principle of patent damages that to rely on the entire market value of the accused product, the patentee must establish that the invention drives demand for that product. Otherwise, the patentee must apportion the royalty base to reflect the relative value of the patented feature. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). As the Court instructed the jury here, "if the value of the accused product is based on many features, including other technical features or patented technologies unrelated to the claimed invention, you may award damages only based on the value of the claimed invention." [Tr. 1529:16-23] Yet Dr. Vellturo neither claimed that the accused feature drove demand for the processors nor apportioned the royalty base despite acknowledging that "these are complicated devices," that "there are lots of things that go into it," and that Intel "contributed enormously to the profit of their products." [Tr. 614:18-615:5, 672:10-17, 758:18-24][3]

---

[3] Dr. Vellturo also improperly relied on documents allegedly showing the accused feature's "priority"

Stragent suggested that it was not violating the Court's jury instruction and the entire market value rule because Dr. Vellturo was using "the smallest saleable unit." [*Id.* 776:9-17] But as many courts have noted, that logic is "fundamentally flawed." *Dynetix Design Solutions, Inc., v. Synopsys, Inc.*, No. C 11–05973 PSG, 2013 WL 4538210, at *3-4 (N.D. Cal. Aug. 22, 2013) ("*LaserDynamics* supports the premise that an apportionment is required even where … the accused product is the smallest salable unit"); *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 726 (E.D. Tex. 2011) (a patentee cannot discharge its duty to apportion by limiting the royalty base to the "smallest saleable unit"), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, No. 1:13–cv–158, 2013 WL 6327852, at *5 (E.D. Va. Dec. 3, 2013) ("the Federal Circuit has not held 'that no further apportionment is ever necessary once the smallest salable unit is determined'") (citation omitted). Indeed, another patentee was recently barred from basing its royalty on the entire value of accused Intel processors. *AVM Techs., LLC v. Intel Corp.*, Civ. A. No. 10–610–RGA, 2013 WL 126233, at *3 (D. Del. Jan. 4, 2013).

Dr. Vellturo further contended that his 1.18% royalty rate was itself an "apportionment" that "identif[ied] the contributory value of this invention." [Tr. 748:9-749:16] But "Supreme Court and [Federal Circuit] precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate." *Uniloc*, 632 F.3d at 1319-20 (adjusting the royalty rate does not cure the prejudice of presenting the defendant's total revenues, which "cannot help but skew the damages horizon for the jury").

In any event, Dr. Vellturo made no attempt to show that his 1.18% rate "identif[ied] the contributory value of this invention." That rate was based on imputing a running royalty rate from the Freescale settlement. Putting aside the impropriety of converting that lump sum into a

---

rank. [Tr. 620:25-624:14] The Court had previously found that "[t]hose documents do not suggest that the priority ratings are based on the features' relative contributions to product prices." [Dkt. 289 at 8-9]

running royalty rate [*see, e.g., LaserDynamics,* 694 F.3d at 79-80], Dr. Vellturo never demonstrated that the patent had the same relative value to Freescale's $2.50 semiconductors and Intel's $2,000 server processors. The Federal Circuit has "stressed that comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010). Dr. Vellturo did not even try to do so.

### III.   STRAGENT LITIGATED THE CASE IN AN UNREASONABLE MANNER

Not only was the substance of Stragent's claims exceptionally weak, but it engaged in unreasonable conduct in pursuing those claims.

#### A.   Stragent's Ruse to Join a Local Charity as a Co-Plaintiff

Stragent's misconduct began before it even filed suit. Shortly after purporting to assign the patents to a local charity, Stragent took back the exclusive right to practice, license, and enforce the patents. [Dkt. 102 Exs. 1 & 2] Stragent and the charity filed their first suit the following week and sued Intel a year later. The purported "assignment" and immediate grant-back license were a litigation-oriented gimmick. As the Court ruled, the charity had no right to enforce the patents, no right to control this lawsuit, no right to decide whether to be a party, no rights to make, use or sell the claimed inventions, and no right to license anyone else. [Dkt. 288] Why would Stragent engage in such an elaborate ploy? Because it apparently hoped the presence of a sympathetic local charity would sway the jury and add pressure on Intel to settle.

#### B.   Stragent's Assertion of a Patent for Which It Sought No Remedy

The only asserted claim of the '244 patent was a method claim, which Stragent contended Intel infringed by its internal use of servers that incorporated accused processors. [Dkt. 247 at 13] But Stragent never provided a damages theory based on that use or sought an injunction. [Tr. 9:1-10, 797:2-17] Nevertheless, Stragent continued to assert the '244 patent until the fourth

day of trial [*id.* 1077:14-18], and Intel incurred the needless costs of defending against it. *See Eagle Servs. Corp. v. H2O Indus. Servs., Inc.*, 532 F.3d 620, 622-23 (7th Cir. 2008) (copyright suit was frivolous because even if infringement had been proven, the plaintiff had acknowledged that it could not prove actual damages and was not entitled to statutory damages).

### C.     Stragent Continued to Assert Patents and Claims Even After Its Expert Had Determined that Intel Did Not Infringe Them

According to Stragent, Dr. Stone determined that Intel did not infringe the '102 patent when he reviewed the source code, and Stragent "immediately dropped" the '102 patent and "very promptly" told the Court that Intel did not infringe. [Tr. 290:23-291:18] But the facts show otherwise. Dr. Stone reviewed Intel's source code in July 2012. [Dkt. 345 Ex. C] Yet Stragent continued to assert the '102 patent in its December 2012 amended complaint. [Dkt. 71] Not until August 2013 did Stragent file a stipulation limiting the case to the '072 and '244 patents, and not until February 2014 did it finally provide Intel with a covenant not to sue on the '102 patent. [Dkt. 133, 265]

Stragent's conduct regarding claims 3 and 4 of the '244 patent was equally dilatory. Dr. Stone testified in October 2013 that the accused Intel products did not infringe those claims. [Dkt. 278 Ex. 1 (Stone Tr.) 171-72] Yet Stragent did not confirm that it was no longer asserting them until a month before trial. [Dkt. 345 Ex. D] *See IA Labs CA, LLC v. Nintendo Co.*, Civ. No. PJM 10-833, 2012 WL 1565296, at *3 (D. Md. May 1, 2012) (the fact that patentee waited two months to disclose that it would abandon a claim and then four more months to actually do so was "evidence of bad faith").

### D.     Stragent Obstructed the Claim Construction Process

Faced with dead-on anticipatory art, Stragent and Dr. Stone schemed to develop claim constructions that would avoid anticipation, including theories that the claimed CRC circuits

could not overlap and that "input data" and "parallel decomposition" had to span an entire packet of data. They did not disclose those interpretations until September 2013, however, and then fought Intel's repeated efforts to have the new claim construction issues resolved. [*See* Dkt. 196 at 8-9] As a result, the additional claims were not construed until the eve of trial. [Dkt. 294] The Court observed at trial that Stragent was "responsible entirely for the delay in the claim construction." [Tr. 492:16-21] *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1325 (Fed. Cir. 2011) (patentee's "failure to engage the claim construction process in good faith" constituted litigation misconduct).

### E.     Stragent Waited Until Intel's Time to Seek *Inter Partes* Reexamination Had Expired Before Asserting Claim 16 of the '072 Patent

All the claims that Stragent initially asserted have been rejected in *inter partes* reexaminations, leading to Actions Closing Prosecution. [Dkt. 345 E-G] The reexaminations did not include claim 16 of the '072 patent, however, because Stragent did not assert that claim until the one-year deadline had passed.[4] And in conduct reminiscent of its obstruction of claim construction, Stragent filed *eight* petitions to reopen the *inter partes* cases to delay invalidation of the claims until after trial. All eight have been denied. [*Id.* Exs. H-J]

### F.     Stragent Engaged in Unreasonable Discovery

Stragent "impose[d] disproportionate discovery costs on [Intel]." *Eon-Net*, 653 F.3d at 1327. While producing only about 60,000 pages itself, Stragent's discovery demands required Intel to produce over 800,000 pages, of which Stragent used less than 0.5% at trial. [Dkt. 345 ¶ 5] In addition, Stragent took more than 25 depositions of Intel employees, totaling over 80 hours, yet it used only 19 minutes from a single one of those depositions during its affirmative

---

[4] Unable to petition for *inter partes* reexamination of claim 16, Intel filed a petition for *ex parte* reexamination. Notably, Stragent sought to add 64 new claims in that later *ex parte* proceeding rather than in the *inter partes* reexamination of the other claims of the '072 patent. The PTO has rejected all of those claims in a final office action. [Dkt. 345 Ex. L]

case. [*Id.* ¶ 6; Tr. 266:10-14] Meanwhile, Stragent "placed little at risk when filing suit" because "[a]s a non-practicing entity, [it] was generally immune to counterclaims" and it "did not face any business risk resulting from the loss of patent protection over a product or process." *Eon-Net*, 653 F.3d at 1327-28.

G.     **Stragent Filed Separate Suits Against Intel's Customers to Pressure Intel into Agreeing to Include Non-U.S. Processors into the Royalty Base**

After having asserted indirect infringement for two years, Stragent suddenly dropped its indirect infringement claims in August 2013. [Dkt. 345 Ex. K] But Stragent was not trying to narrow the case. Instead, the abandonment of those claims was part of a strategy to ratchet up the pressure on Intel by opening a new front. Just days later, it filed suit against three of Intel's largest customers for the accused products, reiterating the same baseless claims: Cisco, No. 6:13-cv-608 (Aug. 26, 2013), Dell, No. 6:13-cv-609 (Aug. 26, 2013), and Hewlett-Packard, No. 6:13-cv-610 (Aug. 26, 2013). Stragent then used those suits to coerce Intel into agreeing that the royalty base in this case would include accused processors that were not manufactured or sold by Intel in the United States. [Dkt. 161 Ex. 1 ¶¶ 3-5, 9] Stragent's apparent goal was to try to collect a royalty on those products without having to establish indirect infringement. This was just one more turn of the screw by Stragent to force settlement before a jury could expose the baselessness of its claims. But Intel still resisted.

IV.    **AN AWARD OF FEES WOULD ADVANCE THE PURPOSES OF SECTION 285**

A determination that this case is exceptional will "advance considerations of compensation and deterrence" [*Octane Fitness*, slip op. at 8 n.6 (quoting *Fogerty*, 510 U.S. at 534 n.19)] by reimbursing Intel "for attorneys' fees it should not have been forced to incur" [*Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013)] and deterring "clearly unwarranted suits" in the future [*Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1372 (Fed. Cir. 2012) (internal quotations and citation omitted)].

-14-

Doing so is particularly important here given Stragent's history of suing companies and settling before trial. [Dkt. 345 Ex. B] Those settlements have "effectively ensured that [Stragent's] baseless infringement allegations remained unexposed." *Eon-Net LP*, 653 F.3d at 1327. Intel incurred enormous costs in bringing Stragent's weak claims and unreasonable litigation conduct to light. And the result benefitted not only Intel, but the general public. The Supreme Court has "recognized the monopoly privileges that Congress has authorized, while 'intended to motivate the creative activity of authors and inventors by the provision of a special reward,' are limited in nature and must ultimately serve the public good." *Fogerty*, 510 U.S. at 526 (internal quotations and citation omitted). As a result, it is "peculiarly important that the boundaries of [patent] law be demarcated as clearly as possible." *Id.* at 527. "That aim is furthered when defendants 'advance a variety of meritorious [patent] defenses." *Mattel, Inc. v. MGA Entertainment, Inc.*, 705 F.3d 1108, 1111 (9th Cir. 2013) (quoting *Fogerty*, 510 U.S. at 527); *accord Eagle Servs.*, 532 F.3d at 625 ("a victory for the defendant enlarges the public domain by denying the plaintiff's right to prevent the defendant-or anyone else-from using the intellectual property alleged to infringe").

## Conclusion

The "totality of the circumstances" make this case "stand[ ] out from others." *Octane Fitness*, slip op. at 7-8. Stragent's substantive case was exceptionally weak. Its patents were invalid over Intel's own prior-art networking processors, and it accused server processors that operate in a fundamentally different way than the patents claimed. Stragent engaged in a wide range of unreasonable litigation tactics that increased the costs and risks to Intel of vindicating its rights. The Court should therefore find that this case is "exceptional" under 35 U.S.C. § 285 and award Intel its reasonable attorneys' fees and nontaxable costs in an amount that Intel will document as provided in Fed. R. Civ. P. 54(d)(2)(C).

Dated: May 8, 2014

Respectfully submitted,

 */s/Chad S. Campbell, with permission by
Michael E. Jones*

Michael E. Jones
  mikejones@potterminton.com
John Bufe
  johnbufe@potterminton.com
Allen Gardner
  allengardner@potterminton.com
POTTER MINTON
110 North College Avenue, Suite 500
Tyler, Texas 75702
Tel.: (903) 597-8311
Fax : (903) 593-0846

Chad S. Campbell
  cscampbell@perkinscoie.com
Timothy J. Franks
  tfranks@perkinscoie.com
Aaron H. Matz
  amatz@perkinscoie.com
Tyler R. Bowen
  tbowen@perkinscoie.com
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Tel.: (602) 351-8393
Fax: (602) 648-7193

David J. Burman
  dburman@perkinscoie.com
Michael D. Broaddus
  mbroaddus@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, 48th Floor
Seattle, Washington 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000

Robert Christopher Bunt
  rcbunt@pbatyler.com
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Tel.: (903) 531-3535
Fax: (903) 533-9687

Attorneys for Intel Corporation

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on May 8, 2014.

*/s/ Michael E. Jones*

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that counsel for Defendants has complied with the meet and confer requirement in Local Rule CV-7(h). The personal conference required by Local Rule CV-7(h) was conducted on April 10, 2014 via telephone conference between counsel for Plaintiff and Defendant. This motion is opposed.  Further, this amended motion is being filed pursuant to the Judge's May 8, 2014 Order, Dkt. 354.

*/s/ Michael E. Jones*